Nott, J.,
delivered the opinion of the court:
This is an action brought upon the bill of lading of the bark Annie Kimball. The damages grow out of injuries to the vessel caused by the defendants, and out of demurrage. They are laid, for the former, at $7,G04 41; for the latter, at $5,600.
The contract on which the action rests is contained in the. following bill of lading:
“ Philadelphia, April 18,18G5.
“ Shipped by Captain Henry Bowman, assistant quartermaster United States Army, in good order, on board the barque Annie Kimball, of Bath, Maine, whereof the undersigned is master for this voyage, now tying in port of Philadelphia, and bound for Port Boyal, South Carolina, (1,061) ten hundred and sixty-one tons (2,240 lbs. each) of anthracite steamer coal, all under deck, which I. promise to deliver in the like good order at the port of Port Boyal, South Carolina, (the damages of the seas only excepted,) unto Lieutenant S. S. Gregory, acting assistant quartermaster, or to his assigns, freight for the same, payable by the United States quartermaster at Philadelphia to the order of John H. Kimball, at the rate of $6 25 per ton, and demurrage $100 per day, allowing twenty-one (21) days for discharging.
“ In witness whereof the master of the said vessel hath affirmed to six bills of lading, all of this tenor and date; one of which being accomplished, the others to stand void.
“(Signed) D. M. HUMPHBEYS.
“ The United States government assumes the war risk on the passage of this vessel out to Port Boyal, South Carolina, and till discharged, the valuation being thirty-six thousand dollars, ($36,000.)
“ HENBY BOWMAN,

“Captain and Assistmt QuartermasterP

*257 On the margin of this bill of lading was a printed note, usually attached to such instruments by the Quartermaster Department:
“ If, on the arrival of this vessel at the port of destination, the consignee should order her to another place to discharge, such order in'all cases to be in writing on the bill of lading.
“ Freight and demurrage payable only on certificate of quartermaster that the cargo has been received in good order.”
The bark was laden under this contract, at Philadelphia, and arrived with her freight at Port Eoyal on the 4th May, 1865.
On the 6th May, Captain John L. Kelly, the quartermaster-in charge at Port Eoyal, ordered the captain of the Annie Kim-ball to “ get under way and sail to Key West.”
The master of the bark objected to this order. He addressed to the quartermaster a protest, and notified him that •he should hold him responsible for “ all losses, damages, and expenses that might occur or be sustained.” He also orally refused to obey the order, saying that he had performed his contract, that the voyage was finished, and that he ivas ready to. deliver the cargo. The captain of the port, who brought the-order, replied that if the master would not go “ they woidd put. in another master and send the vessel to Key West without him.”
On the morning of the 8th May, the government tug Achilles was sent to tow the Annie Kimball to sea. The master again objected to going. He also remonstrated against going then “for the reason that it was not safe, as the tide had ebbed about two hours, and there would not be water enough on the bar to take the vessel safely over.” The master of the tug replied that he “ had orders from the quartermaster to tow the Annie Kimball to sea that morning; that he should do so, and must proceed with his work.”
When the bark started the tide had been running out about two hours; there was, moreover, a heavy swell, and the two rendered it dangerous to cross the bar with a vessel drawing so much water. The bark struck several times in going out. She leaked badly after striking, and it was found necessary to bring her to anchor. Between 7 and 8 o’clock in the evening, to prevent her sinking, she was towed back and run ashore with six feet of water in her hold.
From the 8th May to the 24th June the bark seems to have *258 been detained by the defendants’ agents. On that day she was discharged by the quartermaster; and he certified that. u the detention of the vessel was owing to no fault of the master or crew.”
It had been reported to the quartermaster at Port Eoyal by the captain of the port that it “ was not safe to send the vessel north without a tow and steam-pumps.” She apparently waited for these till the 11th July. On the 18th she reached Boston, whither the tow seems to have taken her.
How long the vessel was detained at Boston by the repairs, and whemshe was returned to the owners, is not shown. Neither does it appear when the master and crew were discharged, nor the amount of their wages. The cost of the repairs is clearly and satisfactorily proven to have been $7,604 41, and that the money was expended strictly in making good the vessel’s injuries.
The first objection inteiqmsed to a recovery goes to the jurisdiction of the court. It is insisted that the injury to the vessel was caused bjr ua part», “of the army engaged, in the suppression of the rebellion? Of such cases jurisdiction is expressly withheld from this court by the Act 4th July, 1864, (13 Stat. L., p. 381.)
We cannot sustain the objection. Laying aside for the moment the claim for injury, it appears that the vessel did discharge her freight at Port Royal; that it was accepted there by the defendants; that the freight was not discharged until the 24th June; and that the quartermaster then certified by endorsement on the bill of lading: “ The detention of the vessel was owing to no fault of the master or crew?
For this detention the bill of lading expressly provided. Twenty-one days for discharging the freight were specifically allowed; for detention beyond that period the defendants were to pay $100 a day. A .previous injury or temporary appropriation by the army could not relieve the defendants from this obligation of- their contract. To this extent we thinlc there can be no question but that the court has jurisdiction.
As to the remaining branch of the case, growing out of the injuries suffered by the vessel, we are of the opinion that there was an impressment but notan “appropriation.” The quartermaster did not seize the vessel, did not take possession of her, did not evict the owners nor their agents, her master and crew. *259 What be did was to compel them to undertake with their vessel an enforced service. This did not divest the property, but left the vessel in the custody of her owners, though in the service of the government; and it entitled them to the benefits of the Acts 3d March, 1849, (9 Stat. L., p. 414,) and 3d March, 1863, (12 id., p. 736.) So far as this phase of the question of jurisdiction is concerned, it was considered and determined in the recent decision in liussell’s Case, p. 121, ante.
It may still be said, however, that the claim grows out of “ damage to property by the army,” or “ apart of the army engaged in the suppression of the rebellion.”
This statute, “ to restrict the jurisdiction of the Court of Claims,” employs three terms to specify those acts of the army which are not the subject of judicial redress. They are “destruction,” “ appropriation,” “ damage.” As to the first, there confessedly was no destruction of the vessel by any one. As to the second, though a term of the “broadest import,” including “all taking and use of property by the army or navy, in the course of the war, not authorized by contract with the government,” as recently held by the Supreme Court in Filor’s Case, (9 Wallace, p. 45,) it still looks to the acquisition of property. It is, as was said in Waters’s Case, (4 C. Cls. R., p. 393,) on the authority of Worcester, “ to tahe from another to one’s self.” As to the third term, there was here “ damage to” the vessel, but it was not done by the army. It sprang from amarine casualty, suffered while the vessel was in the service of the defendants. That service w'as enforced, and the injury, moreover, was induced by the specific interference of the quartermaster with the navigation of the vessel 5 yet the damage was neither intended nor done by the army, and was not of that kind which could bring the case within the inhibition of the act.
I am also of the opinion (though it is not the resolution of the court) that the “ Joint resolution relating to steamboats and other vessels owned in the loyal States” (23d December, 1869, Stat. L., p. —) restored to this court jurisdiction of “claims for steamboats or other vessels taken without the consent of the owner, or impressed into the military service of the United States during the late war in States or parts of States declared in insurrection, provided ‘ that the claimants were loyal at the time their claims originated, and remained loyal thereafter, and were residents of loyal States, and such steamboats or other vessels *260 were in the insurrectionary districts by proper authority.Without discussing the point ! refer to the opinion in Waters’s Case, (4 C. C1s. R., p. 389,) wherein the true construction to be given to the original Act 4th July, 1864, (13 Stat. L., p. 381,) is considered.
Assuming jurisdiction of the case we give this construction to the bill of lading: That it was a contract of affreightment for a single voyage; that the marginal note, printed and placed there by the defendants, was a condition imposed by them for their own benefit in a certain con tin gency; that it specified no compensation for a second voyage, and did not import an obligation requiring* the owners to undertake one, but merely provided for the convenience and protection of the defendants that if any additional voyage was agreed upon between the consignee on the one hand and the master on the other, the agreement should ube in writing on the bill of lading.” We think that a contract to carry freight to a specified port, at an agreed price, cannot be stretched by this marginal note into an obligation to carry the freight to any other port for an undetermined compensation. Therefore we are of the opinion that the owners were entitled to have their vessel discharged and restored to them upon the completion of this voyage, and that the defendants are liable for all damage and injury resulting from this non-compliance with this their agreement.
The case is thought by the majority of the court not to involve the question of marine insurance on which the court was recently divided in Morgan’s Case, because here the voyage was ended, the contract performed, and the owners entitled to have their vessel discharged before this marine disaster happened. It is also thought to be precisely similar to the case of Shultz & Markley, (3 C. Cls. R., p. 56,) because in both cases the casualty was brought about by service beyond the agreed duties of the vessel undertaken against the objection of the master, enforced by a military officer when the ow*ners had fully performed all that their contract required. It is, perhaps, unfortunate that that case was then considered so clear as to require no opinion beyond a statement of the facts, and that the principle upon which it went was implied in a single sentence: “The machinery of the Tallaca broke down because it was strained and weakened by the service enforced upon her by the United States in towing vessels under the circumstances *261 stated, and. thereby the petitioner was subjected to the delay and cost of the repairs, with which the United States are to be charged.”
' To that part of the claim which is for demurrage an objection is raised, also, by the Assistant Attorney General “that it was never presented to the executive department charged with the settlement of such claims.” The subject of the objection has been under advisement in another case, wherein the decision of the court will shortly be announced; but in the case now under consideration it appears that the cause of action, i. e., the injury suffered by the vessel and all the facts and circumstances therewith connected, were distinctly placed before the. Third Auditor and Second Comptroller. It is true that the owners, in apparent ignorance of their legal rights, limited their demand to the repairs, nor asked aught for demurrage; but we regard this second part of the case as a part of the cause of action, going to the measure of damages. If the accounting officers considered the cause of action and rejected it, it is immaterial whether the claimants demanded all the damages they might be entitled to recover or not; if they submitted all the facts of their case to the proper executive department it is not a fatal objection that they failed to present with those facts the correct legal theory for a recovery.
The measure of damages in this case we think to be the same as that awarded in Shultz & Markley, viz: 1st. The cost of making the vessel whole. 2d. The contract rate of condensation (which is here demurrage) up to the time that the crew were discharged. 3d. The same condensation, less the wages and expenses saved to the owmers while they were necessarily deprived of the use of their vessel, during the period of the repairs.
As to the first, we find'it to be $7,604 41; as to the second, we fix the period as beginning on the 26th .May and continuing till the vessel’s arrival in Boston on the 18th July, a period of fifty-three days. As to the third, the claimants have offered no evidence either as to the duration of the time or the amount of the wages and expenses saved to them.
The judgment of the court is that the claimants recover twelve thousand nine hundred and four dollars, ($ 12,904 41.)